UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| HAROLD HEMPSTEAD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No.: 3:21-CV-417-TAV-DCP |
| | ) |
| TONY PARKER, | ) |
| KENNETH WILLIAMS, | ) |
| STEVEN WHEELER, | ) |
| JAMES HOLLOWAY, | ) |
| EMMA RICH, | ) |
| KATIE CAMPBELL, | ) |
| SHAWN PHILLIPS, | ) |
| RAY WORTHINGTON, | ) |
| VELMA BARNETT, | ) |
| EARNEST JONES, | ) |
| NATHAN TOLLITT, | ) |
| PAUL OAKS, and | ) |
| BRETT COBBLE, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION AND ORDER

This case is before the Court on Plaintiff's pro se complaint alleging violations of 42 U.S.C. § 1983 [Doc. 1]. Because Plaintiff is incarcerated, the Court must screen his complaint pursuant to the Prison Litigation Reform Act ("PLRA") to determine whether Plaintiff has stated a justiciable claim. *See* 28 U.S.C. § 1915A.

**I.     SCREENING STANDARDS**

Under the PLRA, district courts must screen prisoner complaints and *sua sponte* dismiss any claims that are "frivolous, malicious, or fail[] to state a claim upon which relief may be granted," or "seek[] monetary relief from a defendant who is immune from such

relief." *See* 28 U.S.C. § 1915A(b); *see also Randolph v. Campbell*, 25 F. App'x 261, 263 (6th Cir. 2001) (holding PLRA screening procedures apply even if plaintiff pays entire filing fee). "[T]he dismissal standard articulated" by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) "governs dismissals for failure state a claim under [28 U.S.C. §§ 1915(e)(2)(B) and 1915A] because the relevant statutory language tracks the language in [Federal Rule of Civil Procedure] 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010). Thus, to survive an initial review under the PLRA, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must establish that he was deprived of a federal right by a person acting under color of state law. 42 U.S.C. § 1983; *Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir. 1990) (stating that "Section 1983 does not itself create any constitutional rights; it creates a right of action for the vindication of constitutional guarantees found elsewhere").

Courts liberally construe pro se pleadings filed in civil rights cases and "hold [them] to less stringent standard than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Rather, all that is required is "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 544, 570. Allegations that give rise to a mere possibility that a plaintiff might later establish undisclosed facts supporting recovery, however, are not well-pled and do not state a plausible claim. *Id.* Further,

2

"formulaic [and conclusory] recitations of the elements of a . . . claim," which are not supported by specific facts are insufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 681.

## II. PLAINTIFF'S RELEVANT ALLEGATIONS

On March 17, 2017, Plaintiff was transferred from the Florida Department of Correction ("FDOC") to the custody of the Tennessee Department of Correction ("TDOC") pursuant to an interstate corrections compact between the states [Doc. 1 p. 2]. Plaintiff was transferred with a fractured right wrist, digestive issues, and lower back problems [*Id*. at 3]. FDOC had issued Plaintiff medical passes for a special diet; assignment to a lower bunk; a back brace and wrist brace; and that he be restricted from activity requiring him to push, pull, lift heavy objects, or stand for a long period of time [*Id*.]. Just prior to Plaintiff's transfer to TDOC custody, FDOC medical officials were attempting to find a surgeon who would perform surgery on Plaintiff's fractured right wrist without general anesthesia due to "the high likelihood" that Plaintiff is allergic to anesthesia [*Id*.].

Plaintiff was notified by a June 7, 2017 letter that a TDOC administrator was in possession of Plaintiff's classification and medical files [*Id*. at 2]. Between August 2017 and August 2021, Plaintiff was advised several times that his medical files were transferred with him between TDOC institutions [*Id*. at 3].

From late 2018 until November 2020 (except for a months-long respite in 2019), Plaintiff suffered pain in his lower back and upper right leg that made it very difficult for him to walk [*Id*.]. This pain also prevented Plaintiff from leaving his housing unit unless

3

forced to do so by staff [*Id.*]. Plaintiff gained approximately 30 pounds from eating only commissary foods during that time, as walking to the chow hall for meals was too painful and difficult [*Id.*].

Plaintiff was transferred to Bledsoe County Correctional Complex ("BCCX") in November 2020 [*Id.*]. At that time, he was informed that the physical therapy treatment he had received at the previous TDOC institution would not be continued, as BCCX did not have a physical therapist, and Covid-19 restrictions would not allow an outside therapist to visit the facility [*Id.*].

On March 31, 2021, Nurse Practitioner Liz Elgan reviewed Plaintiff's medical files and evaluated Plaintiff [*Id.*]. She placed the following medical restrictions in his medical file and on the Tennessee Offender Management Information System ("TOMIS"):

> No heavy lifting 20 lbs max, able to frequently lift or carry objects up to 10 lbs, limited strenuous activity for extended periods of time, no continuous standing or walking for extended periods of time, no repetitive stooping or bending, no climbing or balancing (uneven ground), no participation in weight lifting or strenuous athletics, or outside work in spring and summer, and must be housed on the first floor bottom bunk [*Id.* at 4].

On March 29, 2021, Plaintiff was evaluated by Defendant Dr. Earnest Jones after Plaintiff submitted a sick-call request [*Id.*]. Plaintiff advised Dr. Jones of severe pain in his hip and left knee and told Dr. Jones that he believed the pain was caused by the left side of his body having to bear the majority of Plaintiff's body weight due to the chronic severe pain Plaintiff experienced in his lower back and upper right leg [*Id.*]. Plaintiff requested a steroid shot and/or a wheelchair or cane [*Id.*]. Dr. Jones told Plaintiff "that more than likely, the pain in the [P]laintiff's knee was from overworking it, that he could not give the

4

[P]laintiff a steroid shot or issue him a wheelchair or ca[ne], nor could he issue the [P]laintiff any pain medicine" [*Id*.]. Plaintiff contends that his medical file was on Dr. Jones's desk at the time [*Id*.].

A few weeks later, Plaintiff began having pain his lower right abdomen, and a lump appeared in that area [*Id*. at 5]. Plaintiff submitted a sick-call request regarding his abdominal issues, and he was eventually referred to see Defendant Nurse Practitioner ("NP") Nathan Tollitt on July 15, 2021 [*Id*.]. NP Tollitt told Plaintiff that he had an inguinal hernia[1] that would not be surgically treated or referred for specialist consult — for budget reasons — unless the hernia became strangulated [*Id*.]. NP Tollitt instead placed Plaintiff on "patient observation" [*Id*.]. Plaintiff advised NP Tollitt that a strangulated hernia is life-threating, and NP Tollitt advised Plaintiff that there would be a twelve-hour window where surgery could be performed after the hernia became strangulated [*Id*.]. In other words, according to Plaintiff, NP Tollitt "was going to allow the [P]laintiff to get about [twelve] hours from death" before surgery would be performed [*Id*.]. Plaintiff's medical file, which showed that Plaintiff could be allergic to anesthesia, was on NP Tollitt's desk at the time [*Id*. at 5-6].

---

[1] An inguinal hernia is a protrusion of tissue through a weak spot in the abdominal muscles that may or may not cause pain. While not necessarily dangerous, it can lead to life-threating complications if the hernia becomes strangulated. *See* Mayo Clinic, *Inguinal hernia*, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547 (last visited December 14, 2021).

On August 5, 2021, Plaintiff submitted a sick-call request related to his fractured wrist and hernia in which he requested a hernia belt, a low-residue[2] diet, and an ultrasound [*Id*. at 6]. In the sick-call request, he explained that Florida was obligated to pay for treatment in hopes it would help him obtain surgeries for his hernia and wrist [*Id*.]. He was seen by Dr. Jones on August 24, 2021 [*Id*.]. During that visit, Dr. Jones advised Plaintiff that Centurion (TDOC's contract medical provider) would not allow him to refer Plaintiff to a specialist for surgery on his wrist, and that surgery for his hernia would be arranged if the hernia strangulated [*Id*.].

Plaintiff contends that his hernia is painful, causes constipation, and causes him constant fear that if he does not die from a strangulated hernia, he could die from the anesthesia that he would need for the strangulated hernia surgery [*Id*. at 6-7]. Plaintiff spoke with fourteen inmates at BCCX who have untreated hernias due to Centurion's budget constraints [*Id*. at 7]. Two provided Plaintiff with affidavits, while the other twelve refused to do so "out of fear of being subjected to retaliation" [*Id*. at 7].

Plaintiff contends that he has a due process right to the level of care for his hernia mandated by the settlement agreement in *Copeland v. Jones*, No. 4-15-cv-452 (N.D. Fla. 2017), as he is a Florida inmate [*Id*. at 8]. Plaintiff maintains that Centurion Chief Executive Officer Steven Wheeler is responsible for instituting the practice of denying inmates appropriate treatment until their conditions become life-threatening [*Id*. at 9].

---

[2] A low-residue diet is one that limits high-fiber foods in order to ease digestion. WebMD, *Should You Try a Low-Residue Diet?*, https://www.webmd.com/ibd-crohns-disease/low-residue-diet-foods (last visited December 14, 2021).

Plaintiff states that he has sent several request forms to Dr. Emma Rich, the chief physician at BCCX, and BCCX Health Services Administrator Katie Campbell explaining his rights and asking for immediate surgery [*Id.*]. Plaintiff contends that Centurion's agreement with TDOC gives Kenneth Williams, the Chief Medical Officer, the final authority on inmate care, and that Tennessee Code Ann. § 41-1-404(b) makes BCCX Warden Shawn Phillips responsible for Plaintiff's welfare [*Id.* at 10].

Plaintiff alleges that TDOC and Centurion have a practice of transferring inmates who need specialty medical care to Lois M. DeBerry Special Needs Facility ("Special Needs"), where conditions are so bad that it has deterred many inmates from seeking medical attention [*Id.*].

Plaintiff asserts that TDOC routinely fails to comply with its own housing policies prohibiting inmates with different classifications from being housed together, which results in violence and crime to other inmates, particularly at Special Needs [*Id.* at 10-12]. He maintains that TDOC staff manipulate inmate classifications, particularly those relative to an individual's propensity for sexual violence or sexual victimization, to make it easier to house inmates [*Id.* at 11]. Plaintiff contends that TDOC staff allow gang members and violent inmates control over housing, and that as a result, the introduction of drugs into TDOC facilities has skyrocketed [*Id.* at 12]. Plaintiff avers that he has affidavits in support of these allegations from five inmates, while dozens of other inmates declined to provide affidavits for fear of retaliation [*Id.*].

7

Plaintiff also alleges that inmates transferred to Special Needs routinely lose weight while housed there, as they are deprived of much of the food general population inmates are supposed to receive and are prohibited from ordering commissary [*Id*. at 13]. Plaintiff contends that he has affidavits from three inmates supporting this claim, but that numerous other inmates confirmed these conditions but refused to sign affidavits out of fear of retaliation [*Id*.].

Plaintiff further maintains that Centurion and TDOC have a practice of transferring inmates with medical problems to Special Needs, where they are at high risk for contracting Covid-19 [*Id*.]. Plaintiff asserts that hundreds of staff and inmates enter and exit Special Needs daily, and that the quantity of traffic through the facility places inmates housed in transit housing units at higher risk for Covid-19 [*Id*. at 13-14]. This threat is compounded, according to Plaintiff, by the failure of Special Needs staff to comply with appropriate Center for Disease Control guidelines regarding Covid-19 [*Id*. at 14]. Plaintiff states he knows of one individual who died from Covid-19 contracted at Special Needs, and that he has affidavits from three other inmates expressing their concerns about the facility [*Id*.]. Dozens of other inmates, Plaintiff states, have verified their own apprehension to him but have not provided him with affidavits due to fear of retaliation [*Id*.].

In August 2021, Plaintiff began circulating an "Important Notice" to BCCX inmates to obtain witnesses and information to support a complaint to the Department of Justice regarding the alleged denial of medical care, violence, and conditions at TDOC facilities [*Id*. at 15]. On August 18, 2021, Plaintiff was placed in segregation under "pending

8

investigation" status at BCCX [*Id.* at 16]. Around 7:30 a.m. on August 19, 2021, Office of Investigations and Compliance/Internal Affairs Corporal Velma Barnett met with Plaintiff to determine whether he wrote and distributed the "Important Notice" to BCCX inmates [*Id.* at 16]. Plaintiff admitted that he was the author and advised Corporal Barnett that he had a constitutional right to distribute the notice [*Id.*]. When Plaintiff asked why he was in segregation despite not having done anything wrong, Corporal Barnett allegedly stated, "because the warden [Phillips] asked me to" [*Id.*]. Corporal Barnett then stated she would speak with Warden Phillips about returning Plaintiff to general population [*Id.*].

Around 2:00 p.m. the same day, Classification Counselor Paul Oaks came to Plaintiff's segregation cell and asked him to sign papers reclassifying Plaintiff to the Trousdale Correctional Center [*Id.*]. When Plaintiff inquired about the reclassification, Counselor Oaks purportedly stated that he did not know the reason for the reclassification, but that Warden Phillips wanted the paperwork done and Plaintiff removed from BCCX [*Id.* at 16-17]. Plaintiff advised Counselor Oaks that he wanted to appeal the transfer, and that he believed Warden Phillips was attempting to move him to a facility where he might get hurt or killed in retaliation for Plaintiff's exercise of his First Amendment rights [*Id.* at 17]. Plaintiff states that he eventually signed the papers, however, after Counselor Oaks said that "there would be more problems" if he did not sign the papers [*Id.*].

Thereafter, Plaintiff telephoned friends, a family member, and a member of the media [*Id.* at 17-18]. Plaintiff's family member reached out to the governors of Florida and Tennessee regarding the alleged retaliation Plaintiff was receiving, while a friend

9

emailed the Florida governor, the TDOC Office of Investigations and Compliance, and TDOC Commissioner Tony Parker [*Id.* at 18]. Another friend stated she would email the Florida governor and Trousdale warden to request that Plaintiff be placed in protective custody in the event he was transferred to Trousdale [*Id.*].

During the evening on August 19, 2021, Plaintiff made two tip line calls to the Prison Rape Elimination Act ("PREA") Center explaining Warden Phillips' allegedly retaliatory actions [*Id.* at 19]. Early on August 20, 2021, Plaintiff telephoned the assistant editor for Prison Legal News to inform him of same [*Id.*]. Later the same day, Plaintiff was advised by Corporal Barnett that he would not be transferred to Trousdale but would be reclassified back to BCCX in general population the same morning [*Id.*]. Corporal Barnett allegedly stated that Warden Phillips was being investigated for wrongdoing in association with his attempt to transfer Plaintiff [*Id.*]. Corporal Barnett told Plaintiff not to speak with anyone regarding what she told him, lest it impede the investigation, and that if he did speak of what had transpired, he would be arrested, transferred, or placed in close custody status at another institution [*Id.*]. Plaintiff agreed, and at around 11:30 a.m. on August 20, 2021, he was released back into general population at BCCX [*Id.* at 20].

Plaintiff filed at least eight grievances regarding the claims presented in this lawsuit between July and September 2021 [*Id.* at 21]. During this time, he had several conversations with Grievance Chairperson and Sergeant Ray Worthington, in which Worthington expressed anger about the number of grievances Plaintiff had filed, particularly those related to Special Needs [*Id.* at 21]. In one conversation, Sergeant

10

Worthington told Plaintiff "eight grievances in seven weeks is outrageous, and if you file a grievance on me, I'll be filing a disciplinary report on you" [*Id*. at 21]. Plaintiff maintains that a disciplinary report could increase his custody level, which might cause him to be transferred, lose privileges, receive increased punishment, etc. [*Id*. at 21-22]. Plaintiff contends that he knows numerous inmates who received such retaliatory transfers [*Id*. at 22].

Near the end of October 2021, Plaintiff was advised that BBCX was in the process of transferring "inmate troublemakers," particularly those who filed grievances on staff [*Id*. at 22]. In light of this information, Plaintiff thought it in his best interest to request a transfer to Turney Center Industrial Complex, which he did, but the request was denied [*Id*.]. When Plaintiff inquired into the denial of his request, he was allegedly told that Warden Phillips might want to choose Plaintiff's institution to "make it look like a regular transfer" [*Id*.]. During another conversation with a non-defendant counselor at BCCX, Plaintiff learned that Associate Warden of Treatment Brett Cobble oversaw all the steps required to make the (now rescinded) transfer of Plaintiff to Trousdale [*Id*. at 22-23].

Plaintiff next contends that TDOC officials, Centurion, and "Defendant Campbell"[3] have refused to allow Plaintiff's sister to purchase Plaintiff's medical and dental records pursuant to a medical released signed by Plaintiff, with the exception of a copy of his July 2020 Covid-19 results [*Id*. at 23]. Plaintiff maintains that Defendants Wheeler and Parker have the authority to provide Plaintiff with these records [*Id*. at 24].

---

[3] It is unclear to the Court whether this is a reference to Defendant Katie Campbell.

11

In the instant suit, Plaintiff seeks various injunctive relief, along with compensatory and punitive damages [*Id.* at 27-28].

III. ANALYSIS

A. **Claims at Special Needs Facility**

Plaintiff complains of inmate transfers to Special Needs, where it is alleged that conditions are unsanitary, violence and drugs run rampant, adequate food is not provided, and Covid-19 measures are ignored [Doc. 1 at 10-14]. However, Plaintiff is not housed at Special Needs, nor does he allege that he was housed at Special Needs during any time relevant to this Complaint. Plaintiff cannot assert the constitutional rights of other inmates who might have been affected by such conditions, and therefore, any claims related to the Special Needs facility and its Warden James Holloway will be **DISMISSED**. *See Newsom v. Norris,* 88 F.2d 371, 381 (6th Cir. 1989) (holding that a "a prisoner who initiates a civil action challenging certain conditions at a prison facility in his individual capacity is limited to asserting alleged violations of his own constitutional rights and ... lacks standing to assert the constitutional rights of other prisoners").

B. **Retaliation**

Plaintiff also claims that he was retaliated against by Defendants Barnett, Phillips, Oaks, Cobble, and Worthington by being placed in segregation and threatened with transfer [*Id.* at 15-23].

To establish a retaliation claim, Plaintiff must show that (1) he "engaged in protected conduct; (2) an adverse action was taken against him that would deter a person

12

of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Plaintiff's subjective belief that he has been retaliated against is insufficient to state a claim. *Johnson v. Rodriguez,* 110 F.3d 299, 310 (5th Cir. 1997).

Here, Plaintiff claims he was placed in segregation and threatened with transfer at the direction of Warden Phillips because he published an "Important Notice" to inmates. The Court assumes that Plaintiff's publication of the "Important Notice" constitutes protected conduct. However, Plaintiff was never transferred, and therefore, no adverse action occurred by the threat of transfer. Moreover, a prison transfer is a common occurrence; a lateral transfer to a different facility is not the type of conduct that would deter a prisoner of ordinary firmness from engaging asserting his or her First Amendment rights. *See Smith v. Yarrow*, 78 F. App'x 529, 543-44 (6th Cir. 2003) (collecting cases). Inasmuch as the only allegation against Defendants Cobble and Oaks are that they were involved in the planned transfer, Plaintiff has failed to state a claim against these Defendants, and Defendants Cobble and Oaks will be **DISMISSED**.

Plaintiff alleges only that Defendant Worthington threatened him with disciplinary action for what he deemed frivolous grievances. Plaintiff did not receive an adverse disciplinary report as a result, and therefore, even if Defendant Worthington's speech was

13

not tempered, it did not result in any adverse consequence to Plaintiff.[4]  Accordingly, Defendant Worthington will be **DISMISSED**.

Plaintiff's allegations against Corporal Barnett are that she advised him against speaking about the alleged investigation into Warden Phillips, and that she placed Plaintiff in administrative segregation per the instruction of Warden Phillips.  Plaintiff does not allege that Corporal Bennett had the authority to determine his custodial placement, and, in fact, his allegations confirm that Warden Phillips determined Plaintiff's placement.  Therefore, Corporal Bennett, having not been alleged the cause of wrongdoing of constitutional proportions, should be **DISMISSED**.

However, given liberal construction, the Court finds that Plaintiff's temporary placement in administrative segregation could constitute an adverse action that would deter a person of ordinary firmness from attempting to disperse information to other inmates.  Plaintiff alleges that Warden Phillips was responsible for his placement in administrative segregation, and therefore, Plaintiff's retaliation claim against Warden Phillips will **PROCEED**.

### C. Medical Care/Medical Records

The central issue of Plaintiff's complaint is that he has been denied necessary medical care due to TDOC and Centurion's policies.  The Court notes that Plaintiff alleges that he had a wrist fracture before his transfer to TDOC in 2017, but that he did not submit

---

[4] Verbal threats do not raise a constitutional issue.  *See Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987).

a sick-call request related to his fractured wrist until August 2021 [Doc. 1 p. 2-3, 6]. Plaintiff presents the Court with no information from which it should infer that Plaintiff's wrist remained broken four years after his transfer to TDOC custody, and any claim related to the denial of surgery and/or treatment for Plaintiff's wrist is barred by Tennessee's one year statute of limitations. *See* Tenn. Code Ann. § 28-3-104; *Foster v. State*, 150 S.W.3d 166, 168 (Tenn. Ct. App. 2004) (applying the one-year statute of limitations from Tenn. Code Ann. § 28-3-104 in a § 1983 claim).

However, taking all of Plaintiff's allegations as true, the Court finds that Plaintiff has stated a plausible claim against Tony Parker[5], Kenneth Williams, Steven Wheeler, Katie Campbell, Shawn Phillips, Earnest Jones, Nathan Tollitt, and Emma Rich for the denial of constitutionally adequate medical care; that Plaintiff has stated a plausible claim that Defendants Wheeler and Parker have denied Plaintiff a due process right to his medical records; and that Plaintiff has stated a plausible claim that he was placed in segregation by Warden Phillips as an act of retaliation for the exercise of his constitutional rights. Accordingly, these discrete claims will **PROCEED**.

## IV. CONCLUSION

For the reasons set forth above:

1. Plaintiff's denial-of-medical-care claim against Defendants Tony Parker, Kenneth Williams, Steven Wheeler, Katie Campbell, Shawn Phillips,

---

[5] The Court notes that sovereign immunity prohibits Plaintiff from recovering monetary damages from Defendant Parker, though he is amenable to suit for prospective injunctive relief. *See WCI, Inc. v. Ohio Dep't of Public Safety*, 18 F.4th 509 (6th Cir. Nov. 17, 2021) (citing *Ex Parte Young*, 209 U.S. 123, 152 (1908).

15

Earnest Jones, Nathan Tollitt, and Emma Rich will **PROCEED** as set forth above;

2. Plaintiff's claim related to the denial of his medical records will **PROCEED** against Defendants Wheeler and Parker;

3. Plaintiff's claim that he was retaliated against by Defendant Phillips will **PROCEED**;

4. The Clerk is hereby **DIRECTED** to send Plaintiff service packets (a blank summons and USM 285 form) for Defendants Parker, Williams, Wheeler, Campbell, Phillips, Jones, Tollitt, and Rich;

5. Plaintiff is **ORDERED** to complete the service packets and return them to the Clerk's Office within twenty-one (21) days of entry of this Memorandum and Order. At that time, the summonses will be signed and sealed by the Clerk and returned to Plaintiff for service;

6. Plaintiff is **NOTIFIED** that failure to return the completed service packet within the time required may result in dismissal of this action for want of prosecution and/or failure to follow Court orders;

7. Defendants shall answer or otherwise respond to the complaint within twenty-one (21) days from the date of service. If any Defendant fails to timely respond to the complaint, it may result in entry of judgment by default against that Defendant;

8. All other claims and Defendants are **DISMISSED**; and

9. Plaintiff is **ORDERED** to immediately inform the Court and Defendants or their counsel of record of any address changes in writing. Pursuant to Local Rule 83.13, it is the duty of a pro se party to promptly notify the Clerk and the other parties to the proceedings of any change in his or her address, to monitor the progress of the case, and to prosecute or defend the action diligently. E.D. Tenn. L.R. 83.13. Failure to provide a correct address to this Court within fourteen (14) days of any change in address may result in the dismissal of this action.

**ENTER:**

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

16

Case 3:21-cv-00417-TAV-DCP   Document 5   Filed 12/17/21   Page 16 of 16   PageID #: 52