UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| HAROLD HEMPSTEAD, | ) | | |
|---|---|---|---|
| Plaintiff, | ) | | |
| v. | ) | No.: | 3:21-CV-417-RLJ-DCP |
| TONY PARKER, KENNETH WILLIAMS, STEVEN WHEELER, JAMES HOLLOWAY, EMMA RICH, KATIE CAMPBELL, SHAWN PHILLIPS, RAY WORTHINGTON, VELMA BARNETT, EARNEST JONES, NATHAN TOLLITT, PAUL OAKS, and BRETT COBBLE, | ) | | |
| Defendants. | ) | | |

## MEMORANDUM & ORDER

Plaintiff's "Second Civil Rights Complaint and Jury Request" filed under 42 U.S.C. § 1983 is before the Court for screening in compliance with the Prison Litigation Reform Act ("PLRA"). *See* 28 U.S.C. § 1915A.

**I.     SCREENING STANDARDS**

Under the PLRA, district courts must screen all prisoner complaints and *sua sponte* dismiss any claims that are "frivolous, malicious, or fail[] to state a claim upon which relief may be granted," or "seek[] monetary relief from a defendant who is immune from such relief." *See* 28 U.S.C. § 1915A(b); *see also Randolph v. Campbell*, 25 F. App'x 261, 263 (6th Cir. 2001) (holding PLRA screening procedures apply even if plaintiff pays entire filing fee). "[T]he dismissal standard articulated" by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544 (2007) "governs dismissals for failure state a claim under [28 U.S.C. §§ 1915(e)(2)(B) and 1915A] because the relevant statutory language tracks the language in [Federal Rule of Civil Procedure] 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010). Thus, to survive an initial review under the PLRA, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must establish that he was deprived of a federal right by a person acting under color of state law. 42 U.S.C. § 1983; *Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir. 1990) (stating that "Section 1983 does not itself create any constitutional rights; it creates a right of action for the vindication of constitutional guarantees found elsewhere").

Courts liberally construe pro se pleadings filed in civil rights cases and "hold [them] to less stringent standard than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Rather, all that is required is "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 544, 570. Allegations that give rise to a mere possibility that a plaintiff might later establish undisclosed facts supporting recovery, however, are not well-pled and do not state a plausible claim. *Id.* Further, "formulaic [and conclusory] recitations of the elements of a . . . claim," which are not supported by specific facts are insufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 681.

## II. PLAINTIFF'S RELEVANT ALLEGATIONS

On March 17, 2017, Plaintiff was transferred from the Florida Department of Correction ("FDOC") to the custody of the Tennessee Department of Correction ("TDOC") pursuant to an interstate corrections compact between the states [Doc. 20 p. 2]. Plaintiff was transferred with a fractured right wrist, digestive issues, and lower back problems [*Id.* at 3]. FDOC had issued

2

Plaintiff medical passes for a special diet; assignment to a lower bunk; a back brace and wrist brace; and that he be restricted from activity requiring him to push, pull, lift heavy objects, or stand for a long period of time [*Id*.]. Just prior to Plaintiff's transfer to TDOC custody, FDOC medical officials were attempting to find a surgeon who would perform surgery on Plaintiff's fractured right wrist without general anesthesia due to "the high likelihood" that Plaintiff is allergic to anesthesia [*Id*.]. Plaintiff was advised several times that his medical files were transferred with him between institutions [*Id*. at 3].

From late 2018 until November 2020 (except for a months-long respite in 2019), Plaintiff suffered pain in his lower back and upper right leg that made it very difficult for him to walk [*Id*.]. This pain also prevented Plaintiff from leaving his housing unit unless forced to do so by staff [*Id*.]. Plaintiff gained approximately 30 pounds from eating only commissary foods during that time, as walking to the chow hall for meals was too painful and difficult [*Id*.].

Plaintiff was transferred to Bledsoe County Correctional Complex ("BCCX") in November 2020 [*Id*.]. At that time, he was informed that the physical therapy treatment he had received at the previous TDOC institution would not be continued, as BCCX did not have a physical therapist [*Id*.].

On March 31, 2021, Nurse Practitioner Liz Elgan reviewed Plaintiff's medical files and evaluated Plaintiff [*Id*.]. She placed the following medical restrictions in his medical file and on the Tennessee Offender Management Information System ("TOMIS"):

> No heavy lifting 20 lbs max, able to frequently lift or carry objects up to 10 lbs, limited strenuous activity for extended periods of time, no continuous standing or walking for extended periods of time, no repetitive stooping or bending, no climbing or balancing (uneven ground), no participation in weight lifting or strenuous athletics, or outside work in spring and summer, and must be housed on the first floor bottom bunk [*Id*. at 4].

On March 29, 2021, Plaintiff was evaluated by Defendant Dr. Earnest Jones [*Id*.]. Plaintiff advised Dr. Jones of severe pain in his hip and left knee and told Dr. Jones that he believed the pain was caused by the left side of his body having to bear the majority of Plaintiff's body weight due to the chronic severe pain Plaintiff experienced in his lower back and upper right leg [*Id*.]. Plaintiff requested a steroid shot and/or a wheelchair or cane [*Id*.]. Dr. Jones sent Plaintiff back to his unit without any medical treatment, despite the fact that Defendant Jones was aware of Plaintiff's medical problems and medical history [*Id*.].

A few weeks later, Plaintiff began having pain his lower right abdomen, and a lump appeared in that area [*Id*. at 4]. On July 15, 2021, Plaintiff was advised he had an inguinal hernia[1] after evaluation by Defendant Nurse Practitioner ("NP") Nathan Tollitt [*Id*. at 5, 7]. NP Tollitt told Plaintiff that his condition would be monitored, but that budget constraints would not allow for a specialty consult or surgical remedy unless the hernia became strangulated [*Id*. at 7]. Plaintiff advised NP Tollitt that a strangulated hernia is life-threating, and NP Tollitt advised Plaintiff that there would be a twelve-hour window where surgery could be performed after the hernia became strangulated [*Id*.]. In other words, according to Plaintiff, NP Tollitt "was going to allow the [P]laintiff to get about [twelve] hours from death" before surgery would be performed [*Id*.]. Plaintiff maintains that NP Tollitt knew Plaintiff's medical history at the time of this evaluation [*Id*. at 7-8].

On August 24, 2021, Defendant Jones saw Plaintiff regarding a prior sick call request concerning Plaintiff's hernia and fractured wrist [*Id*. at 8]. During that evaluation, Plaintiff

---

[1] An inguinal hernia is a protrusion of tissue through a weak spot in the abdominal muscles that may or may not cause pain. While not necessarily dangerous, it can lead to life-threating complications if the hernia becomes strangulated. *See* Mayo Clinic, *Inguinal hernia*, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547 (last visited January 26, 2022).

4

requested a hernia belt, a low-residue[2] diet, and an ultrasound [*Id*.]. Dr. Jones advised Plaintiff that Centurion (TDOC's contract medical provider) would not allow him to refer Plaintiff to a specialist for surgery on his wrist, that "nobody was going to contact Florida for the money for the surgeries," but that surgery for his hernia would be arranged if the hernia strangulated [*Id*.].

Plaintiff contends that his hernia has resulted in "pain in his groin and an enlarged scrotum," that it causes constipation, and that it makes it painful for Plaintiff to walk, cough, urinate, defecate, or sit up [*Id*.]. This pain, along with the other pain Plaintiff experiences with his lower back, upper right leg, and left knee has essentially eliminated Plaintiff's ability to participate in classes or religious services, and it causes a "constant state of fear that his lower body and mobility problems are going to cause a quicker deterioration of his hernia until it strangulates" [*Id*. at 8-9]. Plaintiff contends he is also in fear that if he does not die from a strangulated hernia, he could die from the anesthesia that he would need for the strangulated hernia surgery [*Id*. at 9].

Plaintiff maintains that he is being denied necessary medical care in order to increase profits, and that as a Florida inmate, he is entitled right to the level of care for his hernia mandated by the settlement agreement in *Copeland v. Jones*, No. 4-15-cv-452 (N.D. Fla. 2017) [*Id*. at 9].

Plaintiff states that he has sent several request forms to Dr. Emma Rich, the chief physician at BCCX, and BCCX Health Services Administrator Katie Campbell explaining his rights and asking for immediate surgery [*Id*. at 10]. He maintains that Centurion Chief Executive Officer Steven Wheeler is ultimately responsible for determining who receives specialty consults for non-strangulated hernias [*Id*.].

---

[2] A low-residue diet is one that limits high-fiber foods in order to ease digestion. WebMD, *Should You Try a Low-Residue Diet?*, https://www.webmd.com/ibd-crohns-disease/low-residue-diet-foods (last visited January 26, 2022).

5

Plaintiff alleges that TDOC and Centurion have a practice of transferring inmates who need specialty medical care to Lois M. DeBerry Special Needs Facility ("Special Needs"), where conditions are so bad that it has deterred many inmates from seeking medical attention, and that he might be transferred there if his hernia becomes strangulated [*Id*. at 11].

Plaintiff asserts that TDOC routinely fails to comply with its own housing policies prohibiting inmates with different classifications from being housed together, which results in violence and crime to other inmates, particularly at Special Needs [*Id*. at 11-12]. He maintains that TDOC staff manipulate inmate classifications, particularly those relative to an individual's propensity for sexual violence or sexual victimization, to make it easier to house inmates [*Id*. at 12]. Plaintiff contends that TDOC staff allow gang members and violent inmates control over housing, and that as a result, the introduction of drugs into TDOC facilities has dramatically increased [*Id*. at 12-13]. These housing practices, Plaintiff maintains, cause him fear and anxiety, as he is an "Identified Victim" and would be at high risk of assault if housed at Special Needs [*Id*. at 14].

Plaintiff also alleges that inmates transferred to Special Needs routinely lose weight while housed there, as they are deprived of much of the food general population inmates are supposed to receive and are prohibited from ordering commissary [*Id*. at 14]. Plaintiff contends that given his digestive problems, he would be at "high risk of nutritional deprivation" if transferred to Special Needs [*Id*. at 14-15].

Plaintiff further maintains that Centurion and TDOC have a practice of transferring inmates with medical problems to Special Needs, where they are at high risk for contracting Covid-19 [*Id*. at 15]. Plaintiff asserts that hundreds of staff and inmates enter and exit Special Needs daily, and that the quantity of traffic through the facility places inmates housed in transit housing units at

higher risk for Covid-19 [*Id*.]. Plaintiff notes that while he has received a Covid-19 vaccine, TDOC inmates are not provided with booster shots, thus placing him at a higher risk of contracting Covid-19 at Special Needs [*Id*.].

In August 2021, Plaintiff began circulating an "Important Notice" to BCCX inmates to obtain witnesses and information to support a complaint to the Department of Justice regarding the alleged denial of medical care, violence, and conditions at TDOC facilities [*Id*. at 16]. On August 18, 2021, Plaintiff was placed in segregation under "pending investigation" status at BCCX [*Id*. at 17]. Around 7:30 a.m. on August 19, 2021, Office of Investigations and Compliance/Internal Affairs Corporal Velma Barnett met with Plaintiff to determine whether he wrote and distributed the "Important Notice" to BCCX inmates [*Id*.]. Plaintiff admitted that he was the author and advised Corporal Barnett that he had a constitutional right to distribute the notice [*Id*.]. When Plaintiff asked why he was in segregation despite not having done anything wrong, Corporal Barnett allegedly stated, "because the warden [Phillips] asked me to" [*Id*.]. Corporal Barnett then stated she would speak with Warden Phillips about returning Plaintiff to general population [*Id*.].

Around 2:00 p.m. the same day, Classification Counselor Paul Oaks came to Plaintiff's segregation cell and asked him to sign papers reclassifying Plaintiff to the Trousdale Correctional Center [*Id*. at 17-18]. When Plaintiff inquired about the reclassification, Counselor Oaks purportedly stated that he did not know the reason for the reclassification, but that Warden Phillips wanted the paperwork done and Plaintiff removed from BCCX [*Id*. at 18]. Plaintiff advised Counselor Oaks that he wanted to appeal the transfer, and that he believed Warden Phillips was attempting to move him to a facility where he might get hurt or killed in retaliation for Plaintiff's exercise of his First Amendment rights [*Id*. at 18]. Plaintiff states that he eventually signed the

7

papers under duress after Counselor Oaks said that "there would be more problems" if he did not sign the papers [*Id*.].

Thereafter, Plaintiff telephoned friends, a family member, and a member of the media [*Id*. at 18-19]. Plaintiff's family member reached out to the governors of Florida and Tennessee regarding the alleged retaliation Plaintiff was receiving, while a friend emailed the Florida governor, the TDOC Office of Investigations and Compliance, and TDOC Commissioner Tony Parker [*Id*. at 19]. Another friend stated she would email the Florida governor and Trousdale warden to request that Plaintiff be placed in protective custody in the event he was transferred to Trousdale [*Id*.].

During the evening on August 19, 2021, Plaintiff made two tip line calls to the Prison Rape Elimination Act ("PREA") Center explaining Warden Phillips' allegedly retaliatory actions [*Id*. at 20]. Early on August 20, 2021, Plaintiff telephoned the assistant editor for Prison Legal News to inform him of same [*Id*.]. Later the same day, Plaintiff was advised by Corporal Barnett that he would not be transferred to Trousdale but would be reclassified back to BCCX in general population the same morning [*Id*.]. Corporal Barnett allegedly stated that Warden Phillips was being investigated for wrongdoing in association with his attempt to transfer Plaintiff [*Id*.]. Corporal Barnett told Plaintiff not to speak with anyone regarding what she told him, lest it impede the investigation, and that if he did speak of what had transpired, he would be arrested, transferred, or placed in close custody status at another institution [*Id*.at 20-21]. Plaintiff agreed, again under duress, and later that morning he was released back into general population at BCCX [*Id*. at 21]. Plaintiff maintains that even though the attempted transfer was thwarted, he was in constant fear on August 19, 2021, "thinking that he was going to transfer to Trousdale the following morning" [*Id*. at 21].

Plaintiff states that upon his release to general population, the news of the allegedly retaliatory actions taken by staff against him had "spread like a wildfire," and that many of the inmates who were previously willing to provide him with sworn affidavits concerning the issues presented in his Notice were unwilling to assist him [*Id*. at 21-22]. Out of fear of retaliation, Plaintiff "did not distribute his prior Important Notice or any other notices after his release from segregation" [*Id*. at 22].

Plaintiff filed at least eight grievances regarding the claims presented in this lawsuit between July and September 2021 [*Id*. at 22]. During this time, he had several conversations with Grievance Chairperson and Sergeant Ray Worthington, in which Worthington expressed anger about the number of grievances Plaintiff had filed, particularly those related to Special Needs [*Id*. at 22]. In one conversation, Sergeant Worthington told Plaintiff "eight grievances in seven weeks is outrageous, and if you file a grievance on me, I'll be filing a disciplinary report on you" [*Id*. at 22]. Plaintiff maintains that a disciplinary report could increase his custody level, which might cause him to be transferred, lose privileges, receive increased punishment, etc. [*Id*. at 22-23].

Near the end of October 2021, Plaintiff was advised that BBCX was in the process of transferring "inmate troublemakers," particularly those who filed grievances on staff [*Id*. at 23]. In light of this information, Plaintiff thought it in his best interest to request a transfer to Turney Center Industrial Complex, which he did, but the request was denied [*Id*.]. When Plaintiff inquired into the denial of his request, he was allegedly told that Warden Phillips might want to choose Plaintiff's institution to "make it look like a regular transfer" [*Id*. at 23-24]. During another conversation with a non-defendant counselor at BCCX, Plaintiff learned that Associate Warden of Treatment Brett Cobble oversaw all the steps required to make the (now rescinded) transfer of Plaintiff to Trousdale [*Id*. at 24].

Plaintiff next contends that Defendant Campbell and Centurion have refused to allow Plaintiff's sister to purchase Plaintiff's medical and dental records pursuant to a medical released signed by Plaintiff, with the exception of a copy of his July 2020 Covid-19 results [*Id*. at 24-25]. Plaintiff maintains that Defendants Wheeler and Parker have the authority to provide Plaintiff with these records [*Id*. at 25].

In the instant suit, Plaintiff seeks various injunctive relief, along with compensatory and punitive damages [*Id*. at 29-31].

### III. ANALYSIS

#### A. Claims at Special Needs Facility

Plaintiff complains that when an inmate is transferred to Special Needs, he is subjected to unconstitutional conditions, deprived of adequate nutrition, subjected to sexual violence, and exposed to an unnecessary risk of contracting Covid-19 [*Id*. at 11-16]. While Plaintiff is housed at BCCX, he argues that he will be transferred to Special Needs if he needs surgery or a specialty consult [*Id*. at 11-12].

Plaintiff is not, nor has he been at any time relevant to this lawsuit, housed at Special Needs. Because he has not demonstrated any actual or imminent harm from the challenged deprivations and/or conditions at that facility, Plaintiff lacks the necessary standing to assert claims related to the conditions at Special Needs. *See, e.g., Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *King v. Deskins*, 229 F.3d 1152, 2000 WL 1140760, at *2 (6th Cir. 2000). Accordingly, any claims related to the Special Needs facility and its Warden James Holloway will be **DISMISSED**.[3]

---

[3] Plaintiff also argues that Defendants have violated TDOC policies. However, TDOC policies do not create a protectable liberty interest, and therefore, failing to follow those policies does not raise an issue of constitutional significance. *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest).

### B. Retaliation

Plaintiff also claims that he was retaliated against by Defendants Barnett, Phillips, Oaks, Cobble, and Worthington by being placed in segregation and threatened with transfer [*Id*. at 15-23].

To establish a retaliation claim, Plaintiff must show that (1) he "engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Plaintiff's subjective belief that he has been retaliated against is insufficient to state a claim. *Johnson v. Rodriguez,* 110 F.3d 299, 310 (5th Cir. 1997).

Here, Plaintiff claims he was placed in segregation and threatened with transfer at the direction of Warden Phillips because he published an "Important Notice" to inmates. The Court assumes that Plaintiff's publication of the "Important Notice" constitutes protected conduct. However, Plaintiff was never transferred, and therefore, no adverse action occurred by the threat of transfer. Moreover, a prison transfer is a common occurrence; a lateral transfer to a different facility is not the type of conduct that would deter a prisoner of ordinary firmness from engaging asserting his or her First Amendment rights. *See Smith v. Yarrow*, 78 F. App'x 529, 543-44 (6th Cir. 2003) (collecting cases). Inasmuch as the only allegation against Defendants Cobble and Oaks are that they were involved in the planned transfer, Plaintiff has failed to state a claim against these Defendants, and Defendants Cobble and Oaks will be **DISMISSED**.

Plaintiff alleges only that Defendant Worthington threatened him with disciplinary action for what he deemed frivolous grievances. Plaintiff did not receive an adverse disciplinary report as a result, and therefore, even if Defendant Worthington's speech was not courteous, it did not result in any adverse consequence to Plaintiff.[4] Accordingly, Defendant Worthington will be **DISMISSED**.

Plaintiff's allegations against Corporal Barnett are that she advised him against speaking about the alleged investigation into Warden Phillips, and that she placed Plaintiff in administrative segregation per the instruction of Warden Phillips. Plaintiff does not allege that Corporal Bennett had the authority to determine his custodial placement, and, in fact, his allegations confirm that Warden Phillips determined Plaintiff's placement. Therefore, Corporal Bennett, having not been alleged the cause of wrongdoing of constitutional proportions, should be **DISMISSED**.

However, given liberal construction, the Court finds that Plaintiff's temporary placement in administrative segregation could constitute an adverse action that would deter a person of ordinary firmness from attempting to exercise his First Amendment rights. Plaintiff alleges that Warden Phillips was responsible for his placement in administrative segregation, and therefore, Plaintiff's retaliation claim against Warden Phillips will **PROCEED**.

### C. Medical Care/Medical Records

The central issue of Plaintiff's complaint is that he has been denied necessary medical care due to TDOC and Centurion's cost-saving policies. Taking all of Plaintiff's allegations as true, the Court finds that Plaintiff has stated a plausible claim against Tony Parker[5], Kenneth Williams,

---

[4] The threat of adverse action, without more, does not raise a constitutional issue. *See Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987).

[5] The Court notes that sovereign immunity prohibits Plaintiff from recovering monetary damages from Defendant Parker, though he is amenable to suit for prospective injunctive relief.
12

Steven Wheeler, Katie Campbell, Shawn Phillips, Earnest Jones, Nathan Tollitt, and Emma Rich for the denial of constitutionally adequate medical care; that Plaintiff has stated a plausible claim that Defendants Wheeler and Parker have denied Plaintiff a due process right to his medical records; and that Plaintiff has stated a plausible claim that he was placed in segregation by Warden Phillips as an act of retaliation for the exercise of his constitutional rights. Accordingly, these discrete claims will **PROCEED**.

## IV. CONCLUSION

For the reasons set forth above:

1. Plaintiff's denial-of-medical-care claim against Defendants Tony Parker, Kenneth Williams, Steven Wheeler, Katie Campbell, Shawn Phillips, Earnest Jones, Nathan Tollitt, and Emma Rich will **PROCEED** as set forth above;

2. Plaintiff's claim related to the denial of his medical records will **PROCEED** against Defendants Wheeler and Parker;

3. Plaintiff's claim that he was retaliated against by Defendant Phillips will **PROCEED**;

4. Inasmuch as the Clerk has already issued summonses as to these Defendants and returned them to Plaintiff for service [Docs. 13 and 14], no new service packets will be issued;

5. Defendants Parker, Williams, Wheeler, Campbell, Phillips, Jones, Tollitt, and Rich shall answer or otherwise respond to the complaint within twenty-one (21) days from the date of service. If any Defendant fails to timely respond to the complaint, it may result in entry of judgment by default against that Defendant;

6. All remaining claims and Defendants are **DISMISSED**; and

---

*See WCI, Inc. v. Ohio Dep't of Public Safety*, 18 F.4th 509 (6th Cir. Nov. 17, 2021) (citing *Ex Parte Young*, 209 U.S. 123, 152 (1908).

7. Plaintiff is **ORDERED** to immediately inform the Court and Defendants or their counsel of record of any address changes in writing. Pursuant to Local Rule 83.13, it is the duty of a pro se party to promptly notify the Clerk and the other parties to the proceedings of any change in his or her address, to monitor the progress of the case, and to prosecute or defend the action diligently. E.D. Tenn. L.R. 83.13. Failure to provide a correct address to this Court within fourteen (14) days of any change in address may result in the dismissal of this action.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge