UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

HAROLD HEMPSTEAD,    )
           )
   Petitioner,    )
           )
v.           )  No.: 3:21-CV-417-TAV-DCP
           )
TONY PARKER,     )
KENNETH WILLIAMS,   )
EMMA RICH,      )
KATIE CAMPBELL,    )
SHAWN PHILLIPS, and   )
NATHAN TOLLETT,    )
           )
   Defendants.   )

## <u>MEMORANDUM OPINION</u>

Before the Court are Defendants' motions for summary judgment in this pro se prisoner civil rights action under 42 U.S.C. § 1983 [Docs. 139, 141, 145, 148, 151]. Also before the Court are Defendants' joint motion to dismiss for failure to prosecute [Doc. 176] and various non-dispositive motions filed by the parties [Docs. 175, 178, 182, 186, 187, 194, 195, 197]. Upon consideration of the parties' pleadings, the competent summary judgment evidence, and the applicable law, the Court finds that summary judgment should be **GRANTED**. Defendants' motion to dismiss and all other pending motions will be **DENIED as MOOT**, and this action will be **DISMISSED** with prejudice.

# I. BACKGROUND

## A. Factual Background

Plaintiff is a 47-year-old state prisoner with a history of hip and lower back pain [Doc. 144 p. 3]. In November 2020, he was transferred to Bledsoe County Correctional Center ("BCCX"), where healthcare is provided by Centurion of Tennessee ("Centurion") [Doc. 20 p. 3]. The following month, a nurse practitioner evaluated Plaintiff regarding his back and hip pain and determined that he did not need physical therapy [Doc. 144 p. 5]. However, in March 2021, a nurse practitioner placed Plaintiff on Class B restrictions, which mandate limitations on weight-lifting and strenuous activity, as well as a bottom bunk assignment [*Id.* at 4].

On June 2, 2021, Plaintiff submitted a sick call request regarding a lump in his lower abdomen that "often times causes [him] pain" [*Id.* at 9]. The next day, Plaintiff was seen by a sick call nurse [*Id.* at 10]. He told the nurse that the lump had appeared two months earlier and that his pain was four or five on a scale of one to ten [*Id.*]. Plaintiff also told her that he was taking naproxen sodium (Aleve) that he purchased at the commissary for the pain [*Id.*]. The nurse referred Plaintiff to a provider [*Id.*].

On July 15, 2021, Physician Assistant Nathan Tollett evaluated Plaintiff regarding the abdominal lump [*Id.* at 13–14]. Tollett diagnosed Plaintiff with an inguinal hernia[1]

---

[1] An inguinal hernia is a protrusion of tissue through a weak spot in the abdominal muscles that may or may not cause pain. *See* Mayo Clinic, *Inguinal hernia*, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547 (last visited May 15, 2023).

Case 3:21-cv-00417-TAV-DCP   Document 202   Filed 06/29/23   Page 2 of 35   PageID #: 2888

[Doc. 144 p. 14].  In Plaintiff's medical chart, Tollett documented that the lump was a "[r]educible mass @ lower abdominal quadrant" [2] [*Id.* at 14].  He also noted that it was "small," and that Plaintiff was experiencing "intermittent pain" [*Id.*; *see also* Doc. 145-1 ¶ 7].  Tollett determined that surgical intervention was not indicated and instructed Plaintiff to undergo watchful waiting, meaning that Plaintiff should monitor the hernia and return to the clinic with any changes  [Doc. 145-1 ¶ 7].

According to Plaintiff, during the evaluation, Tollett said that "for budget reasons Centurion and Tennessee Department of Corrections ("TDOC") do not refer inmates to have hernia surgeries until they become strangulated, so the Plaintiff would not be able to have surgery on his hernia until it becomes strangulated" [Doc. 20 p. 7].  Plaintiff attests that when he raised concerns about strangulation being a life-threatening condition, Tollett flippantly responded that there would be a twelve hour window in which to perform surgery if Plaintiff's hernia strangulates [*Id.*].  Tollett denies telling Plaintiff that he could not have a hernia surgery due to budget reasons [Doc. 170 ¶ 7].

On August 5, 2021, Plaintiff submitted a sick call request, stating that his hernia was "causing him pain and altering his daily activities" [Doc. 144 p. 15].  He asked for a hernia belt, low residue diet, and ultrasound [*Id.*].  When Plaintiff saw a sick call nurse two days

---

[2] A hernia is "reducible" if the protruding tissue can be pushed back through the abdominal wall.  When a hernia is not reducible and the blood flow to the protruding tissue is restricted or reduced, the hernia is "strangulated."  Strangulation is a life-threatening, but rare condition.  The risk of a hernia becoming strangulated is estimated at 1% to 3% over a person's lifetime.  *See* Alyssa Pastorino & Amal A. Alshuqayfi. *Strangulated Hernia*. (Updated Dec. 19, 2022).  In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2023 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK555972/ (last visited May 15, 2023).

later, he reported that he was experiencing a throbbing pain that was a level four out of ten [*Id.* at 16–17]. He asked for a second opinion on his hernia and repeated his request for a hernia belt [*Id.* at 17–18]. The nurse referred him to a provider [*Id.* at 16].

On August 17, 2021, Tollett reviewed Plaintiff's chart and ordered him a hernia belt size large [*Id.* at 19; Doc. 170-1 ¶ 3]. That same day, Plaintiff was called to the medical department where a nurse issued him the hernia belt [Doc. 144 p. 20]. According to Plaintiff, the belt did not fit because it was two sizes too large [Doc. 165-1 p. 5–6]. Tollett attests that when he ordered the belt he believed it was the appropriate size and that the purported sizing problem was not brought to his attention. [Doc. 170-1 ¶ 3].

On August 18, 2021, Warden Shawn Phillips received a copy of a handwritten notice ("the Notice") that Plaintiff had been mass distributing among the BCCX inmates [Doc. 141-1 ¶ 15]. The Notice—which invited inmates to join a civil rights class action against Centurion and TDOC—read as follows:

Important

> Do you have a hernia that Centurion Medical staff are refusing to arrange for you to have surgery on? Do you believe that inmates who are housed in the transit housing units at Special Needs for medical reasons, are subjected to food and nutritional deprivation? Do you believe that the large amount of inmates and staff who go in and out of the transit housing units at Special Needs on a daily basis, place the inmates who are housed in those units for medical reasons, at high risk of contracting Covid-19? Do you believe that the housing problems that are at TDOC institutions other than Bledsoe, that cause a lot of the violence in TDOC, place the inmates housed in the transit housing units at Special Needs for medical problems, at high risk of being physically and/or sexually assaulted? Has Centurion Medical staff told you, that for budget reasons, they cannot provide you with a certain form of medical care or surgery? If you answered yes to any of these questions and you'd like to be involved with a federal class action civil

4

rights complaint, I'd like to talk with you. My name is Harold Hempstead and I'm in Unit 12. You can also have your people contact Windy at hempsteadpublications8@gmail.com. Please tell your true story in the email.

[Doc. 165-2 p. 8]. Several inmates had posted copies of the Notice on the bulletin boards in all of the housing units [Doc. 20 p. 16]. This led to Plaintiff having "hundreds of conversations" with inmates about the concerns raised in the Notice [*Id.*].

After investigating the situation, Phillips determined that the Notice was causing unrest among the inmates, and he suspected Plaintiff of inciting a riot [Doc. 141-1, ¶¶ 13, 18–19]. He directed TDOC staff to place Plaintiff in a pending investigation cell and ordered a transfer request for Plaintiff to be transferred to Trousdale Turner Correctional Center ("Trousdale") [*Id.* ¶ 25; Doc. 177-2 ¶ 3]. Warden Phillips routinely "swap[s]" inmates with other TDOC institutions for the purposes of operating the prison in a secure manner [Doc. 177-2 ¶ 6].

Phillips names two additional reasons for his actions. First, he says he suspected Plaintiff of violating an unwritten BCCX policy prohibiting inmates from posting flyers on prison bulletin boards [Doc. 141-1 ¶ 23]. Plaintiff attests that there is no such rule, and inmates regularly hang flyers of all types on the bulletin boards [Doc. 168 p. 7]. In addition, Phillips attests that he placed Plaintiff in segregation for Plaintiff's own safety [Doc. 141-1, ¶¶ 18, 25]. According to Phillips, inmates were angry with Plaintiff for telling Centurion staff members that they were supporters of his "cause" [*Id.* ¶ 12, 14]. Plaintiff maintains that he never used the names of any inmates in a conversation with Centurion staff members and that no inmates were upset with him [Doc. 168 p. 5].

5

On the morning of August 19, 2021, Institutional Investigator Corporal Velma Barnett met with Plaintiff in his segregation cell [Doc. 20 p. 17]. Plaintiff told Barnett that he had written and distributed the Notice [*Id.*]. That afternoon, a classification counselor asked Plaintiff to sign papers reclassifying him to Trousdale [*Id.* at 18–19]. Plaintiff initially refused to sign because he believed that if he were transferred to Trousdale he might be raped or killed [*Id.* p. 17–18]. However, the counselor advised him that there would be "more problems" if he did not sign the papers, so Plaintiff complied [*Id.* at p. 18]. After signing the reclassification papers, Plaintiff called his sister, two friends, and a journalist at the Miami Herald to tell them that he was being subjected to a retaliatory transfer [*Id.* at 18–19]. He also made two Prison Rape Elimination Act ("PREA") tip line calls, a call to the PREA center, and a call to Prison Legal News to inform them about his situation [*Id.* at 20].

At some point between August 19, 2021 and August 20, 2021, Warden Phillips determined that it was safe for Plaintiff to remain at BCCX and that he did not need to be transferred [Doc. 177-2 ¶ 5]. On the morning of August 20, 2021, the Warden directed that Plaintiff be reclassified back to BCCX without any disciplinary charges [Doc. 141-1, ¶¶ 26, 27, 29].

Plaintiff attests that prior to his release, Corporal Barnett told him that the Warden was being investigated for possible misconduct in connection with Plaintiff's treatment [Doc. 20 p. 21]. She then warned Plaintiff that if he publicized or filed a grievance about

what had happened, he would be arrested for obstruction of justice, transferred to Trousdale, or placed in close custody at another institution [*Id.*].

On August 24, 2021, Dr. Ernest Jones evaluated Plaintiff's hernia [Doc. 144 p. 21; Doc. 20 p. 8]. Plaintiff told Dr. Jones that pain from his hernia was altering his daily activities and requested a low residue diet, ultrasound, and surgical treatment [Doc. 20, p. 8]. Dr. Jones documented that Plaintiff had a small bulge in the inguinal area that was not in the scrotal sac, that Plaintiff suffered from intermittent pain, and that he had a hernia belt he was not using [Doc. 144 p. 21]. Dr. Jones did not alter Tollett's recommendation for watchful waiting and use of the hernia belt [*Id.*]. According to Plaintiff, Dr. Jones said that due to financial reasons, Centurion would not allow him to refer Plaintiff to a specialist, but that surgery for Plaintiff's hernia would be arranged if the hernia strangulated [*Id.*].

On January 20, 2022, Plaintiff submitted a sick call request regarding his "painful hernia" and lower body mobility problems [Doc. 165-2 p. 75]. He requested a wheelchair, pain medicine, a sonogram, low residue diet, and a referral to a local hernia specialist for a consult [*Id.*]. Plaintiff saw a sick call nurse on January 24, 2022 [Doc. 165-1 p. 5 ¶].

On February 16, 2022, Tollett reviewed Plaintiff's chart and ordered him a hernia belt [Doc. 170-1 ¶ 4]. According to Plaintiff, the belt, which was size extra-large, was much too large for him [Doc. 165-1 p. 5–6]. Tollett attests that when he ordered the belt he believed it was the appropriate size, and that the sizing problem was not brought to his attention [Doc. 170-1 ¶ 4]. After February 16, 2022, Tollett did not treat Plaintiff and was no longer responsible for his care [Doc. 145-1 ¶ 12].

7

## B. Relevant Procedural History

On December 6, 2021, Plaintiff filed a complaint pursuant to 42 U.S.C. § 1983 against various TDOC officials and Centurion medical personnel associated with BCCX [Doc. 1]. He filed an amended complaint on January 26, 2022 [Doc. 20].

After the Court entered a screening order [Doc. 21] and ruled on the Centurion defendants' motions to dismiss [*see* Doc. 98], this action proceeded as to Plaintiff's individual capacity claims against Tollett, Campbell, and Phillips for denial of medical care for his hernia and against Phillips for First Amendment retaliation. This action also proceeded as to Plaintiff's official capacity claims against Centurion and TDOC defendants for denial of medical care for his hernia; against Phillips for First Amendment retaliation; and against TDOC defendants Williams and Strada[3] for denial of access to his medical records. Plaintiff seeks declaratory and injunctive relief as well as money damages [Doc. 20 p. 29–31].

Defendants now move for summary judgment on all claims.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is deemed "material"

---

[3] Because Frank Strada has replaced Tony Parker as TDOC Commissioner, Strada is automatically substituted for Parker as a defendant in his official capacity. *See* Fed. R. Civ. P. 25(d).

8

if resolving that fact in favor of one party "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish an entitlement to summary judgment, the moving party must demonstrate that the nonmoving party cannot establish an essential element of his case for which he bears the ultimate burden of proof at trial. *Celotex*, 477 U.S. at 322.

Once the motion is properly supported with competent evidence, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute as to a material fact. *Id.* at 248. If no proof is presented, however, the Court does not presume that the nonmovant "could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 889 (1990)).

## III.    ANALYSIS

Defendants contend that no genuine issue of material fact exists regarding the claims against them, and that they are entitled to judgment as a matter of law. In addition, the Centurion defendants and Warden Phillips argue that Plaintiff's failure to exhaust administrative remedies entitles them to summary judgment. The Court will first address the issue of exhaustion before turning to the merits of Plaintiff's individual and official capacity claims.

9

### A. Administrative Exhaustion

Under the Prison Litigation Reform Act, a prisoner must exhaust "such administrative remedies as are available" before bringing a civil rights suit in federal court. 42 U.S.C. § 1997e(a). Administrative exhaustion is mandatory, regardless of the type of relief sought, or whether such relief can be granted through the administrative process. *See Ross v. Blake*, 578 U.S. 632, 641 (2016); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)). Moreover, the requirement is one of "proper exhaustion," which requires a plaintiff to complete the grievance procedures put forward by his correctional institution, including procedural rules and deadlines, before bringing suit in federal court. *Woodford*, 548 U.S. at 88, 93.

Failure to exhaust is an affirmative defense for which defendants bear the burden of proof. *Surles v. Andison*, 678 F.3d 452, 458 (6th Cir. 2012). Therefore, "[w]hen the defendants in prisoner civil rights litigation move for summary judgment on administrative exhaustion grounds, they must prove that no reasonable jury could find that the plaintiff exhausted his administrative remedies." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Surles*, 678 F.3d at 455–56).

### 1. TDOC Administrative Process

TDOC follows a three-level process of review for inmate grievances [*See* Doc. 141-3 p. 3–4]. At the first level, an inmate must submit a grievance form within seven days of the occurrence that gave rise to the grievance [*Id.* at 3]. The grievance should

include "specific details, i.e. dates, times, names of persons involved" [*See id.* at 13]. Grievances that are improperly completed or contain insufficient information for processing are returned to the inmate for correction [*Id.* at 3]. After the grievance is received, the supervisor writes a response, which is reviewed by the chairperson, and then the chairperson writes a response on the grievance form [*Id.*]. The inmate can appeal the level one response within five days [*Id.*]. At the second level, the institution's grievance committee drafts a proposed response, and the warden decides whether or not to adopt it [*Id.*]. The inmate can appeal the level two response within five days [*Id.* at 4]. At the third level, TDOC's Assistant Commissioner of Prisons or their designee reviews the grievance and prepares a response which is "final and not subject to appeal" [*Id.*].

### 2. Exhaustion of Denial of Medical Care Claim

In separate motions, Centurion defendants Tollett, Campbell, and Rich move for summary judgment on exhaustion grounds [*See* Doc. 146 p. 12; Doc. 154 p. 16–17; Doc. 152 p. 17–18]. They each contend that Plaintiff failed to exhaust his claims against them because he did not adequately name them in his grievances, as required by TDOC policy [Doc. 170 p. 6–7; Doc. 172 p. 3; Doc. 174 p. 6]. In support of this assertion, they have submitted a record of Plaintiff's medical grievances from September 2020 to March 2022 [*See, e.g.* Doc. 145-2].

11

A review of Plaintiff's medical grievances shows that he filed a grievance regarding his hernia on August 2, 2021 and September 1, 2021[4] [*Id.* at 24, 36]. In the August grievance, Plaintiff stated:

> This grievance is on a pattern and practice of Centurion medical staff and TDOC staff, for budget reasons, denying inmates hernia surgeries until their hernias became strangulated . . .
>
> . . .
>
> On 7-27-21, I was told that the nurse's name that I saw on 7-15-21, is Nathan Tollitt [sic]. During the consultation that I had with the foregoing nurse, he told me that I have a hernia. That for budget reasons Centurion and TDOC don't send inmates to have hernia surgeries until they become strangulated, so I wouldn't be able to have surgery on my hernia until it becomes strangulated . . .

[*Id.* at 24–25]. As requested relief, Plaintiff demanded that TDOC officials, as well as " . . . Centurion and the BCCX Doctor and Health Service[s] Administrator . . . stop the unconstitutional practice of denying inmates hernia surgery until their hernias become strangulated" [*Id.* at 27]. Plaintiff exhausted this grievance on August 24, 2021 [*Id.* at 22, 24].

A reasonable jury could find that the August grievance satisfies the exhaustion requirement as to Tollett and Campbell. Tollett was expressly named. And Campbell—who was the Health Services Administrator at all times relevant to this complaint—was

---

[4] Plaintiff also filed a grievance regarding his hernia on February 22, 2022 [*See* Doc. 145-2 p. 2]. However, because that grievance was filed after the commencement of this lawsuit, Plaintiff cannot rely upon it to satisfy the exhaustion requirement. *See Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) ("The prisoner . . . may not exhaust administrative remedies during the pendency of the federal suit.").

12

named by job title [*See* Doc. 151-1 ¶ 2].  Campbell points to no TDOC rule requiring the use of personal names in grievances.  Indeed, even if TDOC had such a rule, it was not enforced here.  *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010) ("When prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as a general rule will [the court].").

Arguably, Plaintiff also sufficiently named Dr. Rich in the August grievance when he referred to "the BCCX Doctor."  Dr. Rich was the site doctor at BCCX at the time Plaintiff filed this grievance [*See* Doc. 158 ¶ 2].  In any event, Plaintiff named Rich in the grievance he filed on September 1, 2021 [Doc. 145-2 p. 40].  Among other issues raised in that grievance, Plaintiff demanded that "Centurion Dr. Rich" and other officials "stop denying me my rights to treatment and surgery on my . . . hernia" [*Id.*].  Defendant Rich has presented no argument regarding why this grievance, which Plaintiff exhausted on September 15, 2021, cannot satisfy the exhaustion requirement as to Plaintiff's claim against her [*Id.* at 34].

In sum, Defendants Tollett, Campbell, and Rich have not met their respective burdens of showing that they would prevail on the exhaustion issue at trial.  Thus, they are not entitled to summary judgment on that ground.

### 3.    Exhaustion of Retaliation Claim

Warden Phillips argues that he is entitled to summary judgment on the retaliation claim against him because Plaintiff failed to exhaust administrative remedies [Doc. 142 p. 17].  Plaintiff admits that he did not file any grievances regarding this claim

[Doc. 20 p. 25]. However, he asserts that the grievance process was not available to him because "[Corporal] Barnett told him that he would be arrested for obstruction of justice and transferred to Trousdale or placed in close custody segregation status if [he] filed any grievances" [*Id.*].

Although exhaustion is generally a strict requirement, there is an exception: an inmate is not required to exhaust remedies that are not "available." *Ross v. Blake*, 578 U.S. 632, 642 (2016). The Supreme Court has recognized that remedies are not available if prison officials "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44.

To determine whether intimidation excuses a prisoner's non-exhaustion, several circuit courts have adopted a two-part test that includes an objective and a subjective component: (1) that the threat of retaliation would have deterred an inmate of ordinary firmness from using the grievance process and (2) that the inmate was actually deterred. *See, e.g. Turner v. Burnside,* 541 F.3d 1077, 1085 (11th Cir. 2008) (originating the test); *Rinaldi v. United States,* 904 F.3d 257, 269 (3d Cir. 2018) (joining the Ninth and Tenth Circuits in adopting the test from *Turner*); *but see Edmeyer v. Brock*, 11 F. 4th 537, 543 (7th Cir. 2021) (joining the Second Circuit in adopting purely objective test).

The Sixth Circuit has not adopted this two-part test in a published opinion. However, several district courts in this circuit have found it persuasive as a means of imposing reasonable limits on the intimidation exception. *See Peterson v. Pigg*, Civil Action No. 20-12635, 2021 U.S. Dist. LEXIS 170863, at *9 (E.D. Mich. Aug. 2, 2021);

14

*Greene v. United States*, Civil Action No. 6:19-cv-00024-GFVT, 2021 U.S. Dist. LEXIS 60837, at *43–46 (E.D. Ky. Mar. 29, 2021); *Pool v. Klenz*, No. 3:15 CV 1430, 2017 U.S. Dist. LEXIS 43258, 2017 WL 1113359, at *4 (N.D. Ohio Mar. 24, 2017), *aff'd*, No. 17-3426, 2018 U.S. App. LEXIS 1174 (6th Cir. Jan. 17, 2018). This Court also finds it persuasive and will apply it here.

Taking Plaintiff's statements as true, a reasonable jury could find that the objective component is satisfied. Specifically, the threat of a criminal charge—such as Barnett's alleged threat that Plaintiff would be charged with obstruction of justice—could deter an ordinary inmate from using the grievance process. And although the threat of being transferred to another prison does not necessarily rise to the level of intimidation, the threat of being transferred to a more restrictive environment or a significantly more dangerous prison could meet that standard. *See Hill v. Lappin*, 630 F.3d 468, 475 (6th Cir. 2010) ("Being threatened with a transfer to a more restrictive living environment with fewer privileges would deter a person of ordinary firmness from exercising the constitutional right to file grievances."); *Himmelreich v. Federal Bureau of Prisons*, 766 F.3d 576, 577–78 (6th Cir. 2014) (finding that an inmate of ordinary firmness could be deterred from using the grievance process where, among other circumstances, a prison official threatened the plaintiff that if he filed more grievances he would be transferred to a prison where he would "more than likely be attacked and not just beat up").

Phillips argues that Plaintiff's failure to exhaust should not be excused because he was not actually intimidated by Barnett's threat [*See* Doc. 142 p. 19]. He claims that

15

Plaintiff was not intimidated because he was "undeterred in filing grievances at BCCX" [*Id.* at 19]. As evidence in support of that argument, he has submitted twenty-eight grievances that Plaintiff submitted between June 15, 2021 and December 2, 2021, twenty-three of which were filed after Plaintiff's release from segregation [*See* Doc. 191-2; Doc. 191-3; Doc. 191-4; Doc. 191-5; *see also* Doc. 191-1]. He also points to Plaintiff's conduct while in segregation as evidence that he was not afraid to challenge the Warden's authority [Doc. 142 p. 20].

"Evidence that an inmate continued to file substantially similar claims through the same grievance process . . . may be sufficiently compelling to defeat an inmate's assertion of subjective deterrence." *Rinaldi*, 904 F.3d at 269; *see also Sango v. Fleury*, No. 21-2597/2598/2599, 2022 U.S. App. LEXIS 12111, at *7 (6th Cir. May 4, 2022) (finding that inmate's history of grievances belied his claim of intimidation because he continued to file grievances, some of which were against the same prison officials who supposedly intimidated him).

However, Plaintiff did not file grievances that were substantially similar to his retaliation claim during the year following his release from segregation. Phillips's evidence includes only one grievance that Plaintiff filed after his release from segregation on August 20, 2021, and before his filing of this lawsuit on December 6, 2021 [*See* Doc. 191-2 p. 97]. That was the September 1, 2021, grievance mentioned above in connection with Plaintiff's exhaustion of the claim against Dr. Rich [*Id.*]. In that grievance,

Plaintiff complained about Centurion staff's treatment of his hernia and objected to the possibility of being sent to DeBerry Special Needs Facility ("DSNF") for care [*Id.*]. The grievance records reflect that Plaintiff did not file another grievance until February of 2022, seven months later, when he submitted a grievance regarding his hernia and other health concerns [Doc. 191-4 p. 12]. The remainder of Plaintiff's grievances were submitted between August and December of 2022 [*See* Doc. 191-3; Doc. 191-4 p. 17–60; Doc. 191-5].

The Warden argues that Plaintiff's September 1, 2021, grievance—as well as two grievances that Plaintiff claims to have filed on September 7, 2021, and September 9, 2021, regarding conditions at DSNF [*see* Doc. 20 p. 22]—show that he was not intimidated because those grievances raise topics mentioned in the Notice [Doc. 142 p. 19–20]. Warden Phillips has not produced a copy of the September 7 and September 9 grievances. However, assuming that Plaintiff filed them, those grievances, like the September 1, 2021, grievance, were only indirectly related to Plaintiff's retaliation claim. They did not mention Warden Phillips, retaliation, or the circumstances of Plaintiff's segregation.

Phillips also points out that Plaintiff filed three grievances that implicated the Warden in retaliation: one for retaliatory transfer; one for retaliatory refusal to transfer; and one for denial of access to Westlaw [*See* Doc. 142 p. 19; *see also* Doc. 191-3 p. 56; Doc. 191-5 p. 4, 24]. However, Plaintiff filed those grievances between September 2022 and October 2022, over a year after his placement in segregation. Given their remoteness

in time from the events underlying Plaintiff's retaliation claim, those grievances do not disprove Plaintiff's claim of intimidation when applying the applicable summary judgment standards.

The Court agrees with Phillips that Plaintiff's vocal self-advocacy during his stay in segregation suggests that he was not afraid to challenge the Warden's authority at that time. When Plaintiff learned of his impending transfer to Trousdale he contacted multiple parties—his sister, friends, a journalist, Prison Legal News, and the PREA tip line—to enlist their help in fighting what he deemed a retaliatory transfer. However, Plaintiff made these calls on August 19, 2021, before the alleged threat by Barnett the following day. Also, given that Plaintiff expended significant effort while in segregation to avoid being transferred to Trousdale, a reasonable jury could find that the threat of being transferred to that very prison was enough to silence him on the issue of retaliation.

In addition to his argument that Plaintiff was not actually intimidated, Warden Phillips argues that Plaintiff cannot be excused from the exhaustion requirement because he made no affirmative effort to use the administrative process [Doc. 142 p. 21]. Generally, "[t]he Sixth Circuit requires some affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable." *Napier v. Laurel Cnty.*, 636 F.3d 218, 223 (6th Cir. 2011) (citations omitted). However, when, as here, an inmate asserts that he was deterred from using the grievance process by a prison official's intimidation, a showing of affirmative efforts to exhaust is not strictly

18

required.  *See Gilmore v. Ormond*, No. 19-5237, 2019 U.S. App. LEXIS 30007, at *4 (6th Cir. Oct. 4, 2019) (quoting *Rinaldi,* 904 F.3d 257 at 267) ("[A] threat of substantial retaliation" by a prison official constitutes intimidation and is sufficient to make the grievance system unavailable to an inmate.").  Indeed, if Plaintiff had attempted to use the grievance process despite Barnett's alleged threat, that attempt would show that he was not actually intimidated.

The Court does not suggest that Plaintiff would win on the exhaustion issue at a later stage of litigation.  In particular, the likelihood that Barnett actually made such a threat—which Phillips does not question and which the Court does not address here—may be open to challenge.  However, taking Plaintiff's statements as true and viewing the evidence in the light most favorable to him, a reasonable juror could find that intimidation rendered the grievance process unavailable.  Accordingly, Plaintiff's failure to exhaust is not fatal to his retaliation claim.

### B.    Individual Capacity Claims

The Court now turns to the merits of Plaintiff's individual capacity claims.  To demonstrate individual liability under § 1983, Plaintiff must establish (1) that the defendant acted under color of state law, and (2) that his actions violated the rights secured by the Constitution and/or laws of the United States.  *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010).

19

It is uncontested that the Defendants acted under color of state law.[5]  At issue is whether they violated Plaintiff's constitutional rights.

To establish a violation of his federal rights, a §1983 plaintiff must make a clear showing that the particular defendant was personally involved in the activity that forms the basis of the complaint.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government official defendant, through the official's own individual actions, has violated the Constitution.").  A supervisor cannot be held liable based upon a mere failure to act or the right to control employees.  *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).  Rather, the plaintiff must show that the supervisor actively engaged in unconstitutional behavior.  *Id.*

### 1.     Denial of Medical Care

Plaintiff claims that Defendants Tollett, Campbell, and Phillips violated his Eighth Amendment right to adequate medical care by failing to adequately treat his hernia [*See, e.g.* Doc. 20 p. 26].  An Eighth Amendment claim for the denial of adequate medical treatment is composed of two parts: (1) an objective component, which requires a plaintiff to show a "sufficiently serious" medical need; and (2) a subjective component, which

---

[5]   Employees of private companies that perform traditional state functions, such as providing medical care to inmates, act under color of state law for the purposes of § 1983.  *Martin v. Warren Cnty.*, 799 F. App'x 329, 337 (6th Cir. 2020) (citing *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018)).

20

requires the plaintiff to show the defendants acted with "deliberate indifference" to that need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

For the purposes of argument, the Court will assume that Plaintiff's hernia constitutes a sufficiently serious medical need. However, he cannot establish that Defendants acted with deliberate indifference.

"Deliberate indifference requires more than mere negligence, more even than medical malpractice." *Mitchell v. Hininger*, 553 F. App'x 602, 604 (6th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "It requires something akin to criminal recklessness: The defendant must 'know that inmates face a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it.'" *Mitchell*, 553 F. App'x at 604 (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (cleaned up)). When, as here, a prisoner has received some medical attention and the dispute concerns the adequacy of the treatment provided, a prisoner cannot establish deliberate indifference unless his treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005).

### a. Physician Assistant Nathan Tollett

Plaintiff alleges that Defendant Tollett showed deliberate indifference to his hernia by failing to recommend surgery or other interventions such as pain medication, an

ultrasound, wheelchair, or hernia belt that fit [Doc. 20 p. 7; Doc. 165 p. 6].[6]  Tollett maintains that he treated Plaintiff appropriately [Doc. 170-1 ¶¶ 5–6].

Although the care Tollett provided was minimal, the record does not show that it was grossly incompetent.  On July 15, 2021—the only time Tollett performed an in-person evaluation of Plaintiff—Tollett diagnosed Plaintiff with an inguinal hernia.  He noted that the hernia was small, reducible, and causing only intermittent pain.  Based on that evaluation and the other information available to him, he determined that surgery was not indicated and that watchful waiting was appropriate.  Tollett did not prescribe any pain medication.  However, medical records reflect that Plaintiff was taking over the counter pain medication that he purchased through the commissary.  Then on August 17, 2021, in response to Plaintiff's complaint that the hernia was "causing him pain and altering his daily activities," Tollett ordered Plaintiff a hernia belt which Plaintiff received the same day.  Dr. Jones, who examined Plaintiff's hernia on August 24, 2021, affirmed Tollett's assessment that watchful waiting and a hernia belt were appropriate.  Finally, Tollett ordered Plaintiff a different sized hernia belt on February 16, 2022, after Plaintiff submitted a sick call request regarding his lower body problems and "painful hernia."  Although Plaintiff claims the two hernia belts that Tollett prescribed did not fit him, there is no

---

[6] Plaintiff also claims that Tollett  disregarded his possible allergy to anesthesia, thereby placing him at risk of complications should he require emergency hernia surgery in the future [Doc. 20 p. 7–8].  "An Eighth Amendment claim may be premised on deliberate indifference to exposing an inmate to an unreasonable risk of serious harm in the future."  *Dodson v. Wilkinson*, 304 F. App'x 434, 439 (6th Cir. 2008) (citing *Helling v. McKinney,* 509 U.S. 25, 36 (1993)).  However, Plaintiff has provided no evidence in support of this possible allergy, and his speculations are not competent summary judgment evidence.

22

evidence that Tollett was made aware of the problem or that Plaintiff ever complained. In Tollett's professional judgment, during his treatment of Plaintiff from July 15, 2021 to February 16, 2022, Plaintiff did not need surgery, a wheelchair, an ultrasound, or other intervention [Doc. 170-1 ¶ 6]. In short, the record reflects that Tollett provided a limited, but reasonable amount of care based on his professional judgment that more was not needed.

Plaintiff maintains that Tollett's failure to recommend surgery was deliberately indifferent because it was based on budget concerns [Doc. 20 p. 7]. Certainly, if a prison official knowingly delays *necessary* medical treatment due to non-medical reasons, his conduct in creating the delay constitutes deliberate indifference. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017). Here, however, Tollett determined surgery on Plaintiff's hernia was *not* necessary [Doc. 145-1 ¶ 7]. Therefore, Tollett's decision not to recommend surgical treatment, even if cost was a consideration, does not rise to the level of deliberate indifference. *See Winslow v. Prison Health Servs. (PHS)*, 406 F. App'x 671, 674 (3d Cir. 2011) ("[P]risoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment.").

The Court recognizes that Plaintiff was not satisfied with the care he received. However, his disagreement regarding the proper course of treatment does not rise to the level of an Eighth Amendment violation. *Darrah*, 865 F.3d at 372; *see also Ward v. Kemen*, No. 3:08-CV-P238-S, 2010 U.S. Dist. LEXIS 101763, at *8–9 (W.D. Ky. Sep. 24, 2010) (finding that inmate's dissatisfaction with treatment did not amount to deliberate

23

indifference where prison doctor examined his hernia twice and having determined that it was easily reducible, counseled him regarding proper exercise and referred him for evaluation for a hernia belt). Because the treatment Tollett provided was adequate and was not so grossly incompetent as to shock the conscience, Tollett is entitled to summary judgment on this claim.

### b. Health Services Administrator Katherine Campbell

Plaintiff's deliberate indifference claim against Campbell fails because he has not shown that she was personally involved in his medical care. During the relevant time period, she did not render Plaintiff any care, was not responsible for his care, and did not provide clinical supervision for any physicians who were responsible for his care [Doc. 151-1 ¶¶ 3–4]. Contrary to Plaintiff's assertion, there is no evidence that she refused to process consults for non-emergency hernia surgeries for Plaintiff or for anyone else [*See* Doc. 20 p. 11]. As Centurion's administrative supervisor, Campbell did respond to Plaintiff's medical grievances and indicated that he was being treated appropriately [*See* Doc. 145-2 p. 4, 28]. However, "[t]he 'denial of administrative grievances or the failure to act' by prison officials does not subject supervisors to liability under § 1983." *Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

Because Plaintiff has not shown that Campbell was personally involved in his medical care, he cannot show that she was deliberately indifferent to his needs. Campbell is entitled to summary judgment on this claim.

24

### c. Warden Shawn Phillips

Like Campbell, Warden Phillips cannot be held liable for deliberate indifference because he was not personally involved in Plaintiff's medical care. Phillips is not responsible for administering medical care to inmates [Doc. 141-1 ¶ 6]. And he did not provide Plaintiff with any medical care or participate in any decision-making concerning Plaintiff's care [*Id.* ¶ 7]. Plaintiff argues that Phillips should be held liable because he is responsible for "allowing" Centurion to systematically refuse to authorize non-emergency hernia surgeries [Doc. 20 p. 11]. However, even assuming such a practice exists, Phillips cannot be held liable as a supervisor based merely on his failure to act. *See Bass*, 167 F.3d at 1048. Rather, to establish supervisory liability, Plaintiff must show that Phillips actively participated in or encouraged unconstitutional conduct. Plaintiff has not made that showing. Accordingly, Phillips is entitled to summary judgment on this claim.

### 2. Retaliation

Plaintiff claims that he had a First Amendment right to distribute the Notice, in which he invited other inmates to join a class action lawsuit against prison conditions [Doc. 20 p. 19]. He asserts that Phillips retaliated against him for exercising that right by placing him in segregation for two days before ultimately releasing him back to the general population [*Id.*].

To prevail on a First Amendment retaliation claim Plaintiff must show that (1) he engaged in protected conduct; (2) a sufficiently serious adverse action was taken against him that would deter a prisoner of "ordinary firmness" from continuing to engage in the

protected conduct; and (3) there is a causal connection between the first two elements— that is, the adverse action was motivated at least in part by Plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). The Sixth Circuit has recognized that placement in administrative segregation is a sufficiently adverse action to satisfy the second component of a retaliation claim. *See id.* ("In the prison context, an action comparable to transfer to administrative segregation would certainly be adverse.").

Phillips argues that Plaintiff's conduct was not protected because it was incompatible with legitimate prison objectives and even if it was protected, he is entitled to qualified immunity [Doc. 142 p. 23–24]. The Court agrees.

Prisoners retain certain constitutional rights, such as the First Amendment right to pursue non-frivolous grievances and civil rights lawsuits. *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996). However, those rights are not absolute. A prison inmate's speech is not protected by the First Amendment if it is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell,* 417 U.S. at 822; *see also Turner v. Safley*, 482 U.S. 78, 89 (1987) (recognizing that prison officials may impinge on an inmate's constitutional rights if the official's action "is reasonably related to legitimate penological interests").

Here, Phillips contends that Plaintiff's distribution of the Notice was inconsistent with prison order and security, which are clearly legitimate penological goals [*See* Doc. 142 p. 23]. Courts accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to

26

preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (citations omitted); *see also Sandin v. Conner*, 515 U.S. 472, 482 (1995) ("[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment."). "In the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell*, 417 U.S. at 827.

The Court affords considerable deference to the Warden's determination that the Notice, and Plaintiff's efforts in promoting it, posed a security threat. Phillips, not the Court, is in the best position to assess what presents a safety concern at BCCX. And the text of the Notice provides support for Phillips's view. Although it did not explicitly encourage unrest, the Notice was clearly critical of Centurion and TDOC. It called for collective action in the form of a class action. And it was "mass-distributed," posted on bulletin boards, and led to Plaintiff speaking with "hundreds" of other inmates. Given the subject matter and scale upon which the Notice was apparently distributed, Phillips reasonably anticipated a possible disruption.

Moreover, there is not substantial evidence in the record that Phillips's response was exaggerated. Having anticipated a disruption, the Warden was entitled to act preemptively by removing Plaintiff from the general population before a riot or other unrest occurred. *See King v. Zamiara*, 680 F.3d 686, 700 (6th Cir. 2012) (recognizing that maintaining order in a prison "may require acting preemptively based on concerns that have not yet

27

materialized"). And the record does not suggest that Plaintiff's two-day placement in administrative segregation involved unduly restrictive conditions. Indeed, Plaintiff was afforded ample opportunity to communicate with friends, his sister, and others outside the prison regarding his situation.

Even if in retrospect the Warden's response was exaggerated, Phillips is entitled to summary judgment based on qualified immunity. Qualified immunity protects governmental employees from individual liability as long as their conduct does not violate clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Clearly established law is not defined at a high level of generality." *Vanderhoef v. Dixon*, 938 F.3d 271, 278–79 (6th Cir. 2019). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Once a defendant raises the defense of qualified immunity, the plaintiff has the burden of showing that it does not apply. *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

Here, Plaintiff makes the general claim that Phillips retaliated against him for "asserting his right to freedom of speech" [Doc. 20 p. 28]. However, he has not pointed to any legal authority showing that he had a clearly established constitutional right to engage in the kind of inmate-to-inmate mass communication at issue here. The Court has not been directed to any Sixth Circuit recognition of such a right. Indeed, the Supreme Court has held that prisoners do not have an independent right to communicate with one another. *See*

28

*Turner*, 482 U.S. at 91–93 (upholding regulation restricting communication between prisoners at different prisons).[7] Accordingly, the Court concludes that Plaintiff's right to distribute the Notice—if he had such a right—was not clearly established.

*Griffin v. Berghuis*, 563 F. App'x 411 (6th Cir. 2014), which also involved a prisoner's § 1983 retaliation claim against a warden, is instructive here. There, the plaintiff, Griffin, was removed from his elected position on the Warden's Forum and transferred to another prison after he wrote a letter to the warden's supervisor. *Id.* at 412–13. The letter—which was distributed to other inmates on the Forum—expressed concern that prison staff would retaliate against Forum members for their efforts to improve prison conditions. *Id.* Upholding summary judgment in favor of the warden, the Court of Appeals found that the warden reasonably perceived the letter as a security risk. *Id.* at 418. The Court reasoned that even though the letter did not expressly call for any unrest, it showed an intent by Griffin and his fellow representatives on the Forum to "pit themselves against the administration in a manner that would disrupt the legitimate objectives of the institution." *Id.* This was especially true given that there were other indications that Forum members were engaging in collective action. *Id.* Ultimately, affording considerable deference to prison officials, the Court found that the letter was not protected by the First

---

[7] The Court also notes that practically speaking, "*[p]ro se* prisoners generally may not bring class action lawsuits concerning prison conditions." *Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008); *see also Ziegler v. Michigan*, 90 F.App'x 808, 810 (6th Cir. 2004) (finding "non-attorneys proceeding *pro se* cannot adequately represent a class").

Amendment because it was inconsistent with legitimate prison objectives, and even if it was protected, the warden was entitled to qualified immunity. *Id.* at 419.

Like the warden in *Griffin*, Phillips determined that an inmate's distribution of written materials that were critical of prison staff posed an inherent security threat. And as in *Griffin*, this security threat was compounded by evidence of collective action. Plaintiff did not act alone. He attests that other inmates assisted him by posting the Notice on prison bulletin boards. And Plaintiff spoke with numerous inmates about joining his potential lawsuit. Even if Phillips over-reacted to this situation by temporarily placing Plaintiff in segregation, qualified immunity protects him—as it protected the warden in *Griffin*—from liability for that mistake.

The Court notes that Phillips makes two additional arguments in favor of summary judgment. First, he claims that Plaintiff's conduct was not protected because it violated an unwritten rule against prisoners posting flyers on bulletin boards [Doc. 142 p. 23–24]. He also claims that Plaintiff cannot show causation, as required for a retaliation claim, because even without the Notice, he would have placed Plaintiff in segregation to protect him from inmates who were angry with him [*Id.* at 24]. However, Plaintiff attests that there is no unwritten rule against prisoners posting on bulletin boards and that no inmates were angry with him. Hence, there are genuine issues of material fact regarding the Warden's additional arguments.

30

Nevertheless, as discussed above, Phillips is entitled to summary judgment because the security risk posed by Plaintiff's distribution of the Notice rendered Plaintiff's conduct unprotected.

## C. Official Capacity Claims

Finally, the Court turns to Plaintiff's official capacity claims. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). To prevail on an official capacity claim under § 1983, Plaintiff must show (1) that he suffered a deprivation of a federal right, and (2) that the entity's policy or custom was the moving force behind the deprivation. *Id.* at 165–66 (citations omitted).

### 1. Official Capacity Claims Against Centurion Defendants

Plaintiff has sued Campbell as Health Services Administrator and Rich as BCCX Doctor for enforcing a policy of denying non-emergency hernia surgeries for financial reasons [*See* Doc. 20 p. 26]. These claims are essentially against their employer, Centurion. Centurion, a private company, may be sued because it serves a traditional state function of providing medical care to inmates. *See West v. Atkins*, 487 U.S. 42, 56 (1988).

As evidence that Centurion maintains an unconstitutional policy of denying surgical intervention for hernias until strangulation, Plaintiff attests that Tollett and Dr. Jones told him about the policy. He also provides three affidavits from fellow inmates, attesting that they suffer from a painful hernia and that unidentified members of Centurion medical staff told them they were not eligible for surgery due to financial reasons [Doc. 165-2 p. 2–7].

31

In affidavits of their own, Campbell and Rich deny knowledge of such a policy [Doc. 158 ¶ 22; Doc. 151-1 ¶ 24; *see also* Doc. 151-2 ¶ 6].

Regardless of whether there is a genuine dispute over the nature of Centurion's policy on hernia surgeries, Plaintiff cannot establish liability against Centurion because he has not shown that he suffered a violation of his right to adequate medical care. As discussed above, Tollett was not deliberately indifferent to his medical needs. And a broader view of Plaintiff's medical records shows that Centurion staff as a whole were not deliberately indifferent. Plaintiff was seen multiple times by sick call nurses who referred him to a provider for further medical attention. Following the diagnosis of his hernia, Plaintiff received a second opinion from Dr. Jones. And there is no evidence that Plaintiff was denied necessary care. Accordingly, Defendants Campbell and Rich are entitled to summary judgment on the official capacity claims against them.

### 2. Official Capacity Claims Against TDOC Defendants

Plaintiff brings three official capacity claims against the TDOC defendants. Those claims are essentially claims against the State of Tennessee. *See Hix v. Tenn. Dep't of Corr.*, 196 F. App'x 350, 355 (6th Cir. 2006) (holding TDOC is equivalent of the "State"); *see also Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993) (explaining that in an action for money damages against a state officer acting in an official capacity, "the plaintiff seeks damages not from the individual officer, but from the entity from which the officer is an agent").

Plaintiff cannot obtain money damages against the State of Tennessee for two reasons. First, "a State is not a person within the meaning of § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *Hix*, 196 F. App'x at 355 (holding TDOC is not a "person" within the meaning of § 1983). Moreover, the Eleventh Amendment prohibits suits against a state or its agencies in federal court for damages, unless Congress has abrogated its immunity, or the state has expressly waived it. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–101 (1984); *Quern v. Jordan*, 440 U.S. 332, 345 (1979). The State of Tennessee has not waived its immunity to suit under § 1983. *Berndt v. State of Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986). Thus, Plaintiff's claims for money damages against the TDOC Defendants in their official capacities must be dismissed.

In addition to the bar posed by sovereign immunity, Plaintiff's three official capacity claims against the TDOC defendants fail on the merits.

First, Plaintiff claims that Strada, Williams, and Phillips should be liable in their official capacities because they are complicit in Centurion's alleged policy of denying non-emergency hernia surgeries [Doc. 20 p. 11]. However, as discussed above, Plaintiff has not shown that any defendant was deliberately indifferent to his medical needs.

Second, Plaintiff claims that Phillips should be liable in his official capacity for retaliating against him for exercising his First Amendment rights. However, as discussed above, Plaintiff has not established that his First Amendment rights were violated.

Third, Plaintiff claims that Strada as TDOC Commissioner and Williams as Chief Medical Officer failed to provide him with access to his medical records [*Id.* at p. 24–25]. The Court previously dismissed this same Fourteenth Amendment due process claim against the Centurion defendants [Doc. 98 p. 19]. Specifically, the Court found that Plaintiff failed to state a cognizable claim because he did not allege that corrective procedures were inadequate, as required for a due process claim [*Id.* at 12]. The Court also found that Plaintiff's claim failed because he does not have a constitutionally protected interest in his medical records [*Id.* at 12–13]. Plaintiff's due process claim against the TDOC defendants fails for the same reasons.

Moreover, the record shows that corrective procedures were available to Plaintiff: he filed a grievance regarding the medical records on August 17, 2021, Campbell responded, and TDOC processed Plaintiff's appeal up through the third level of review [Doc. 191-2 p. 72–92]. That Plaintiff did not receive the answer he wanted does not render the corrective process inadequate. *Rice v. Mich. Dep't of Corr.*, No. 1:07-cv-578, 2007 U.S. Dist. LEXIS 86465, at *13 (W.D. Mich. Oct. 10, 2007) ("[I]t is clear that Plaintiff was able to use the grievance process. He simply disagreed with the reason for rejecting his grievance, which states no claim of constitutional dimension.").[8]

---

[8] The Court notes that TDOC provided Plaintiff with a copy of his medical records in connection with this lawsuit [*See* Doc. 139-3 p. 2].

34

Accordingly, as with his official capacity claims against the Centurion defendants, Plaintiff's official capacity claims against the TDOC defendants fail because he has not established a violation of his constitutional rights.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment [Docs. 139, 141, 145, 148, 151] will be **GRANTED**.  Defendants' joint motion to dismiss [Doc. 176] and all other pending motions [Docs. 175, 178, 182, 186, 187, 194, 195, 197] will be **DENIED as MOOT**, and this action will be **DISMISSED** without prejudice.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

**ENTER:**

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE